Filed 12/10/13  In re Richard O. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re RICHARD O. et al., Persons Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARIAH A.,<br><br>Defendant and Appellant. | F066890<br><br>(Super. Ct. Nos. JD127364-00, JD127365-00, JD127366-00, JD127367-00, JD128367-00)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Louie L. Vega, Judge.

Elysa J. Perry, under appointment by the Court of Appeal, for Defendant and Appellant.

Theresa A. Goldner, County Counsel, Elizabeth M. Giesick, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Mariah A. appeals from orders of the juvenile court terminating her family reunification services, ordering long-term foster care for four of her sons, and granting

sole physical custody of a fifth son to his father. The juvenile court also ordered a plan of adoption for Mariah's daughter and set a hearing for the termination of Mariah's parental rights as to the daughter.

In prior writ proceedings in the daughter's case, we reversed the juvenile court's finding that the Kern County Department of Human Services (the department) provided Mariah with reasonable reunification services. In the present case, the department has submitted on the issue of reasonable reunification services, conceding that remarks in our prior opinion indicated that the same considerations would apply in the cases of Mariah's sons. Mariah makes several other arguments in this appeal, which the department's briefing does not address.

We conclude that our previous holding on reunification services applies here as well, as the department anticipates. We also agree with Mariah on an additional issue the department chose not to brief: The juvenile court abused its discretion when it denied Mariah's request for a continuance of the 18-month review hearing held on March 14 and 15, 2013. Only three days before that hearing, the department provided Mariah with a new supplemental report that substantially altered the nature of the case. This final report contained new allegations that Mariah had obtained and used child pornography. For the first time, the report described as minimal Mariah's efforts to comply with her reunification plan and to rectify the problems that caused the children's detention. Also for the first time, the report recommended that Mariah's reunification services be terminated and that four of the children be placed in foster care permanently. By denying the continuance, the court violated due process principles by depriving Mariah's counsel of the time necessary to defend against these new features of the department's case.

The department is mistaken in its argument that the appeal is moot as to Mariah's youngest son, James A. We reverse the juvenile court's orders as to all five boys[*] and remand for a new hearing.

## FACTUAL AND PROCEDURAL HISTORIES

Welfare and Institutions Code section 300[†] petitions were filed on behalf of Mariah's five children, Richard O., Jeremiah O., David O., William O., and Gabriella A. on September 19, 2011.[‡] The petition was amended several times and a petition for the youngest child, James A., was added after his birth in February 2012. (*Mariah A., supra,* at pp. 2-3.)

Mariah had a long history of mental illness. Her diagnoses included posttraumatic stress disorder, depressive disorder, and dependent personality traits with borderline and schizoid features. (*Mariah A., supra,* at pp. 3-4.) Mariah lived with her husband, Michael A., who also suffered from mental illness, specifically bipolar disorder, and who was the father of Gabriella. (*Id.* at pp. 2-3.) Neither parent was receiving mental health treatment. (*Id.* at p. 3.) The father of the four older boys, Richard O., Sr., was deceased.

Richard is 10 years old, David is 9, William is 8, Jeremiah is 6, Gabriella is 3, and James is 1. Some of the children have special needs. The four older boys have been diagnosed with attention deficit hyperactivity disorder. William was found also to have oppositional defiant disorder, and Richard has been diagnosed as mentally retarded. One doctor believed William showed signs of Asperger's syndrome. Mariah reported that another doctor once diagnosed William with bipolar disorder and schizophrenia.

---

[*]This appeal does not include the case of Mariah's daughter.

[†]Subsequent statutory references are to the Welfare and Institutions Code.

[‡]Some of the facts are detailed in our previous opinion in *Mariah A. v. Superior Court* (June 18, 2013, F066889) (*Mariah A.*), which granted writ relief to Mariah in the case of the daughter, Gabriella A. We take judicial notice of that opinion and of the record in that case, and we rely on them in part in our statement of the facts here.

According to the petitions, Michael was emotionally abusive to the children and Mariah failed to protect them from him. As a reaction to emotional abuse by Michael, William hit himself in his face repeatedly with a shoe, causing swelling and bruising to his eye and nose. He was brought to an emergency room with blood on his legs and feet. On another occasion, William slammed his head on the floor and gave himself a concussion. The petitions also asserted that the children were at risk because Mariah was unable to care for them due to her mental illness. William faced additional risk from the parents' shortcomings because of his self-destructive behavior.

The court found the allegations in the petition true at the jurisdictional hearing on February 24, 2012. The children were placed in foster homes.

In the report prepared by the department for the dispositional hearing, the social worker stated that Mariah had been uncooperative. She signed a plan in which she agreed to separate herself and the children from Michael by obtaining a restraining order; but after obtaining it, she allowed Michael to return and recanted all her previous statements about his abusive behavior. Mariah and Michael both resisted treatment for their mental illnesses. Some visitation supervisors gave Mariah positive ratings for her parenting during visits, while others emphasized the boys' unruly behavior and Mariah's difficulty in controlling them. Two psychological evaluations were prepared for each parent. The evaluators agreed that Michael would not benefit from reunification services because of his mental health issues, but they disagreed about Mariah. One evaluator concluded that she also would not benefit from services, but the other opined that she could benefit if provided with strong support.

The department recommended denying reunification services to Michael and providing them to Mariah. The recommended services included parent training, child neglect counseling, and individual psychological counseling. The court adopted these recommendations at the dispositional hearing on July 5, 2012. At the same hearing, the court placed James with his father, John T., at John T.'s request.

4.

The six-month review hearing was delayed several times and took place on March 14 and 15, 2013, when it was treated as an 18-month review hearing. Before this review hearing and after the dispositional hearing, the department issued a series of notices and reports. On December 17, 2012, the department served Mariah with a notice of hearing (for January 9, 2013, a date that was continued), stating that the social worker recommended continuing family reunification services to Mariah and dismissing family maintenance services for John T. In a report prepared on December 28, 2012, for the same hearing date, the social worker stated that all objectives of Mariah's reunification services plan had been or were being met and that she was receiving mental health services. Mariah visited the children consistently, but the visits were chaotic and the social worker was concerned that Mariah might be unable to manage the children's behavior. Further, Mariah continued to maintain a relationship with Michael, her husband, and she had not demonstrated an ability to protect the children from him. The social worker described Mariah's efforts as acceptable and her progress as moderate. The department recommended that reunification services be continued for Mariah. At the same time, it recommended that James's dependency case be terminated and that he remain in the sole physical custody of his father, John T., and in the joint legal custody of Mariah and Michael.

The social worker prepared supplemental reports on January 8, February 8, and February 13, 2013, communicating new developments. The first supplemental report stated that on January 3, 2013, during a visit with Gabriella, Michael told a social worker that Mariah said she had been arrested for child molestation and child pornography. He claimed Mariah had a fetish for young girls. The department could not confirm that there had been any such arrest.

The second supplemental report described a conversation on January 9, 2013, in which Mariah told social workers that Michael had raped a 10-year-old girl. The social workers told her they did not believe this and also that Mariah had fabricated the story

5.

Michael had relayed to them about child molestation and child pornography. On January 22, 2013, social workers learned that Michael had been found dead in Quartzsite, Arizona. Mariah, who had been reported kidnapped, was with him. The cause of death was not known.

A social worker spoke to an agent of the United States Department of Homeland Security, who had been investigating the child pornography allegations. The agent opined that Mariah was a pathological liar. Michael had told the agent that he got child pornography for Mariah because Mariah liked it.

The third supplemental report included investigative reports from the sheriff's departments in Kern County and in La Paz County, Arizona. Kern County deputies received a report from two friends of Mariah's saying that Mariah had sent them text messages asserting that Michael had kidnapped her and taken her to Arizona. The deputy who authored the report was told by another deputy that federal agents had executed a search warrant the previous week, seeking evidence of child pornography, at a mobile home where Mariah and Michael had been living. Mariah was entered into a database as a missing person and a kidnapping victim. Kern County deputies referred the matter to Arizona authorities. After an investigation, La Paz County deputies found Mariah and Michael at a campsite in Quartzsite on January 20, 2013. Mariah told a La Paz deputy she was fine, then changed her mind and said she had been kidnapped. Then Mariah stopped talking to the deputy and would only nod yes or shake her head no. The deputy arrested Michael, but then released him for lack of evidence.

Michael was found dead at the campsite two days later. A La Paz deputy had driven Michael to a bus stop in Blythe, California, on the night of his arrest and release. Mariah said she packed up the campsite in the morning and drove to Blythe to look for Michael. She did not find him, and stayed the night in Blythe. She returned to the campsite the following morning and found Michael's body lying on its back in a wash. An empty tequila bottle and a glass smoking pipe were on the ground beside the body.

6.

In each of these three supplemental reports, the department stated that its recommendations remained unchanged. Because of the new information in them, however, hearings scheduled for January 9 and February 13, 2013, were continued to March 14, 2013.

On February 19, 2013, counsel for the children filed an ex parte request for a hearing to obtain a suspension of the mother's visits with the children. The request stated that "[l]aw enforcement reports have connected mother to significant involvement with child pornography." The department took the position that the visits were supervised, nothing untoward had happened during any visits, and the record did not contain sufficient evidence about child pornography, so there were no grounds to change the visitation order. The court denied the request.

The social worker prepared a fourth supplemental report on March 7, 2013. Counsel for Mariah received it on March 11, 2013, three days before the hearing. In this report the department stated for the first time that it believed Mariah had possessed and used child pornography. Investigative reports on this subject by Homeland Security agent Michael Allan were attached for the first time. Allan stated that after receiving a tip in July 2012, America Online informed the government of distribution of pornographic images of children from Michael's e-mail account. Allan interviewed Michael and Mariah. Michael admitted he had sent pornographic images of children to Mariah. He said Mariah asked him for them because she "has a thing for little girls," and he complied because "he thought if he kept her happy she would stay in the trailer and not cause any more trouble for him." He denied he had any interest in child pornography himself. He allowed Mariah to use his credit cards to finance purchases of child and adult pornography on the internet. Michael claimed Mariah had caused him to be arrested on false pretenses on many occasions. He described an incident in which she had him arrested by blaming him after she burned down a building, and another incident in which he was arrested after she hit herself in the face and said he had done it.

Mariah was the tipster whose information led to the discovery of the distribution of child pornography from Michael's e-mail account. At the time she gave the tip, Mariah also reported to the Secret Service that Michael had made threats against the President of the United States on YouTube.

Just as Michael told Allan the real interest in child pornography came from Mariah, Mariah told Allan that Michael was the real culprit. She told Allan that Michael confessed to raping a 10-year-old girl, and claimed he often told her during sex that he wished she were a little girl. She said she first found out about the pornography when she lent the computer she shared with Michael to a friend, and the friend found images Michael had stored. She said she had received pornographic images of children from Michael via text message after she told him she was "into girls" to "improve their sex life"; but she told Allan she had not meant underage girls. Mariah said she reported the pornography to authorities after she safely moved out of the trailer.

"When confronted with the improbability of the story Mariah had been telling agents for an hour and a half," Allan wrote, "Mariah finally revealed that both she and Michael have an interest in child pornography." She said Michael "made her look at child pornography because their sex life was not good enough" and she "only looked at it to make him happy." This had been going on for "a couple of years," "approximately once a week." Michael downloaded the images and stored them on the computer.

For the first time, the department described Mariah's efforts to comply with her reunification plan as "minimal" and stated that she "minimally availed herself of the services provided to facilitate a return" of the children. Also for the first time, the department recommended that Mariah's family reunification services be terminated and that permanent plans of out-of-home placement be established for all the children, except for James, for whom an award of sole physical custody to John T. and termination of jurisdiction continued to be recommended.

Mariah's counsel objected to holding the hearing under these circumstances. He requested a continuance, stating that he was unable to prepare a defense to the new allegations and recommendations in the three days since he had received the latest report. Counsel for the department argued that the final report was "timely" and claimed that the attached investigative reports had been provided to all parties in February and that Mariah's counsel had them before the hearing on the ex parte request to suspend visitation on February 19. When the court asked if that meant there was "nothing new," the department's counsel said yes. Mariah's counsel replied that the recommendation to terminate reunification services because of minimal compliance with the case plan was new, and that with additional time he could produce documents and witnesses to prove that Mariah's compliance had been complete. The department stated that it was not disputing that Mariah had completed the components of her case plan and had received certificates of completion from the service providers. It said it was only "attacking [Mariah's] behaviors outside of those counseling requirements" and arguing that she "has not been able to implement … what she learned from those counseling classes in parenting her children" as indicated by the children's unruly behavior during visits and Mariah's limited ability to control it. The department did not, however, offer to withdraw its assertion that Mariah's compliance had been minimal. The court said "[w]e will [trail]§ those issues" and denied the request for a continuance.

The court did not, however, trail the new issues raised by the final report. Instead, it heard extensive argument about the pornography allegations. Counsel for John T. argued that Mariah should be denied visitation with James because of these allegations. The department argued that the allegations showed that returning the children to Mariah would be detrimental. The court said, "I'm not going to say I am not considering the

_____

§The reporter's transcript says "trial those issues." We assume this is a typographical error.

9.

most recent revelations as to the mother's admitted involvement in child pornography. Apparently it's what she stated, and that whatever she thought she was looking at was child pornography, then that's how she treated. it. And apparently it gave rise to certain responses on her behalf that were reported in the report."[**]

Richard testified that he wanted to go home. Based on offers of proof by counsel for the children, the parties stipulated that Jeremiah, William, and David would say the same. Counsel for the children argued for continuation of reunification services.

The juvenile court made the recommended finding that Mariah's efforts to comply with her case plan and avail herself of services had been minimal, despite the department's concession that Mariah completed her case plan; and it made the recommended ruling that reunification services be terminated. The court also denied Mariah's section 388 petition, which she had filed in December 2012 and that had requested the court to return the children to her because she had completed her reunification plan, and Michael, whose abuse had originally led to the children's detention, was dead.

In the course of its ruling, the court stated that Mariah's "credibility is as low as it can be determined" because she had, at an earlier stage of the case, testified that she never had any kind of relationship with John T., who turned out to be the father of James. She also claimed to have terminated her relationship with Michael, but really never did so before his death; and she made statements against Michael to obtain a restraining order which she later recanted. Although Mariah completed the programs in her case plan,

---

[**]In our opinion in the related writ proceedings, *Mariah A., supra,* at pages 6-7, footnote 4, we stated that the juvenile court did not rely on the allegations that Mariah used child pornography. In fact, the court's statement that it was considering those allegations appears in the immediate context of the court's rulings on James. In spite of our comment in our prior opinion, however, there is no reason to believe the court's consideration of the allegations was limited to James's case.

"she continues, as the [department] has argued, not to show any improvement in her ability to parent the children when they are in her presence."

For Gabriella, the court ordered an adoption assessment and a hearing for the termination of Mariah's parental rights. The court found that the four older boys, Richard, David, William and Jeremiah, were not adoptable. It ordered a permanent plan of long-term foster care. The four were not placed together. For James, the court awarded joint legal custody to John T. and Mariah and sole physical custody to John. It terminated its jurisdiction over James.

Pursuant to California Rules of Court, rule 8.452, Mariah filed a petition for extraordinary relief from the order setting a hearing for termination of her parental rights as to Gabriella. We granted relief, holding that the record failed to establish that the department had provided Mariah with reasonable reunification services. We stated:

> "We are troubled in this case with the paucity of information in the record regarding the department's compliance with mental health services, a critical component of [Mariah's] reunification plan.… [¶] At the conclusion of the disposition hearing in July 2012, the juvenile court specifically ordered that petitioner receive individual counseling to address the issues of self-esteem and codependency, mental health services, and to comply with her medical doctor's recommendations and prescriptions. [¶] There are, however, very few references in the record concerning the nature of psychological and medical treatment [Mariah] received.… [¶] The current record reveals nothing concerning the nature, duration, and quality of psychological and psychiatric services obtained by [Mariah]. The social workers' reports have much more detailed information concerning the mental health services offered to the four older boys than those offered to [Mariah]. Psychological and psychiatric services were a major component of [Mariah's] reunification plan, but we know little about them. This record is largely silent on how [Mariah] procured services, whether she benefitted from those services, and whether the department facilitated or properly monitored this part of [Mariah's] reunification plan. [¶] If the department failed to follow through in facilitating or otherwise assisting [Mariah] with obtaining psychological and psychiatric services, the juvenile court's finding that reasonable services were provided to [Mariah] necessarily comes into question." (*Mariah A., supra,* at pp. 11-12.)

11.

We vacated the order setting a hearing for termination of parental rights as to Gabriella and remanded Gabriella's case to the juvenile court with directions to hold a new hearing on "the issue of what mental health services were provided to [Mariah], whether these services were adequate, and whether they were provided or offered to [Mariah] in a timely manner." If the court found on remand that reasonable mental health services had not been provided, we ordered it to reopen reunification services and provide reasonable mental health services for six months. (*Mariah A., supra*, at p. 13.) We pointed out that the same considerations would have applied to the other children if the court had set a hearing to terminate Mariah's parental rights as to them. (*Id.* at p. 2, fn. 2.)

Mariah filed the notice of appeal in the present case on March 20, 2013. In her opening brief, she raised four issues: whether the juvenile court abused its discretion by denying her request for a continuance of the hearing held on March 14 and 15, 2013; whether there was substantial evidence to support the finding that returning the children would create a substantial risk of detriment to them; whether there was sufficient evidence to support the finding that reasonable reunification services had been provided to Mariah; and whether the court abused its discretion when it denied Mariah's section 388 petition.

The department did not submit a formal respondent's brief. Instead, it filed a letter conceding that we had found a lack of substantial evidence of reasonable reunification services in Gabriella's case and had indicated our intention to take the same approach if the same issue were raised for the other children. For those reasons, it submitted the case on that issue as to the four older boys without further discussion. It argued at the same time that James's case was moot because he was placed with his father and jurisdiction was terminated; it asked us to dismiss the appeal as to James. The letter did not make any reference to Mariah's other three arguments.

12.

## DISCUSSION

### I. *Sufficiency of evidence of reasonable reunification services*

Applying the analysis we set out in our opinion in the prior writ proceedings, Mariah contends that the record contains insufficient evidence to support the juvenile court's finding that the department provided her with reasonable reunification services. In light of the remarks in our prior opinion, the department has decided to submit on this issue without presenting appellate argument.

We accept the department's concession. The juvenile court's orders will be vacated and the case remanded with instructions to consider the adequacy of the mental health services provided to Mariah. We will discuss later in this opinion the department's contention that James's case is moot.

### II. *Denial of continuance*

Mariah argues that the juvenile court abused its discretion when it denied her request for a continuance of the hearing held on March 14 and 15, 2013. She says she was deprived of due process of law when the court proceeded with the hearing even though the department had presented damaging new allegations and had reversed its recommendation three days before the hearing. The department has chosen to present no briefing on this issue.

We agree with Mariah. Although Mariah has cited no authority requiring the department to provide any specific number of days of notice to allow a parent to prepare a defense to adverse new recommendations or allegations before an 18-month review hearing, general due process principles require reversal. At least under the circumstances of this case, three days is not enough lead time to cope with new developments that alter the character of the case and do so at a procedural turning point where the court's decisions determine whether the family will ever be reunified.

The 18-month review hearing is a major milestone in juvenile dependency proceedings. Ordinarily, if a child is not returned to its parent after this hearing, the court

13.

must calendar a hearing under section 366.26 to establish a plan for the child's permanent placement with another caretaker. (§ 366.22, subd. (a).) If reunification services are terminated at the hearing, permanency and stability for the child become the court's priority; reunification of the family ceases to be an objective (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309-310); and "termination of parental rights becomes the preferred placement option" (*David B. v. Superior Court* (2006) 140 Cal.App.4th 772, 778). A parent's fundamental right to the companionship, care, and custody of his or her child (*Santosky v. Kramer* (1982) 455 U.S. 745, 758-759; *In re B.G.* (1974) 11 Cal.3d 679, 688) therefore is at stake at an 18-month review hearing.

A juvenile court cannot deprive a parent of this right without due process of law, including adequate notice, an opportunity to be heard, and an opportunity to cross-examine adverse witnesses. (*In re Josiah S.* (2002) 102 Cal.App.4th 403, 412; *Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 756-757.) The determination of whether the procedure afforded was adequate under due process principles is made via a balancing test. (*In re Malinda S.* (1990) 51 Cal.3d 368, 383.) "The balancing standard considers the private interest that will be affected by the agency's action, the risk of an erroneous deprivation of that interest, the interest in informing parents of the basis for and consequences of the action and in enabling them to present their side of the story, and the agency's interest in expeditious decisionmaking as affected by the burden [that would be] caused by [the procedure the appellant claims was required]." (*In re James Q.* (2000) 81 Cal.App.4th 255, 267.)

In this case, the private interest affected—the family's chance for reunification—is of the highest order and involves, as we have said, fundamental rights. The risk of erroneous deprivation here was considerable. The department accused Mariah of a serious crime at the last minute. Mariah contends that, if given time, she could have subpoenaed and cross-examined witnesses—such as Homeland Security agent Michael Allan—upon whose evidence the accusation was based. The court stated expressly that it

14.

was relying on this evidence. Yet the evidence was nebulous and open to challenge. Mariah told Allan her late husband obtained the pornography and she looked at it only to please him. It was Mariah who reported the pornography to the authorities. The department's counsel told the court that Mariah "admitted that she viewed child pornography for sexual pleasure, and she admitted liking young girls," but that is not quite what Allan's reports say. They say that Mariah looked at images obtained by Michael because he wanted her to and to "get them in the mood for sex." They also say Mariah told Michael she "liked girls," not young girls. Counsel for the department said Allan's reports were provided to all parties in February 2013, but there are no proofs of service in the record showing this to be the case. Further, at the hearing on February 19, 2013, the department's position was that the new investigative reports were not sufficient grounds to suspend visitation; there was no indication at that time that the reports would lead to a reversal in the department's recommendations. With more time, Mariah's counsel might have been able to mount an effective defense to the claim that Mariah obtained child pornography and used it for her own gratification. Finally, the department's interest in expeditious resolution of the case would not have been greatly burdened by a continuance. The hearing was the only review hearing that had occurred in the case—earlier hearings all having been continued—and one more continuance would not have made a great difference. The children's interest in permanency and stability also would not have been significantly burdened. In this case, the parent's interest in the requested procedure substantially outweighed the department's interest in avoiding that procedure.

The denial of due process was not harmless. To avoid being reversible, a deprivation of due process in a juvenile dependency proceeding must be harmless beyond a reasonable doubt. (*In re Thomas R.* (2006) 145 Cal.App.4th 726, 734; *In re Dolly D.* (1995) 41 Cal.App.4th 440, 446.) Mariah's cross-examination of witnesses whose statements were reported in the department's final report could have undermined the

department's contention that Mariah had obtained child pornography and used it for her own sexual gratification. Also, with more time, Mariah's counsel might have been able more effectively to counter the department's new position that Mariah's compliance efforts had been minimal, as well as the department's new reliance on the disorderly nature of Mariah's visits with her mentally disabled children to prove her failure to gain from reunification services. A reasonable doubt exists as to whether a continuance could have led to a different outcome.

Mariah also argues that Allan's reports and other hearsay statements in the department's final supplemental report should have been excluded from evidence because she did not have an opportunity to subpoena and cross-examine the hearsay declarants. Many types of hearsay found in agencies' reports are admissible evidence in juvenile dependency proceedings and can amount to substantial evidence supporting a judgment, but parents still have a right to subpoena hearsay declarants. (§ 355, subds. (b)-(d).) We need not resolve the hearsay issue in this appeal. Mariah has not cited any place in the appellate record where the juvenile court ruled on this issue, and the juvenile court can consider it in the first instance if it is raised on remand.

Lastly, Mariah argues that the denial of the continuance was an abuse of the juvenile court's discretion under section 352, which provides standards for the granting of continuances in juvenile dependency matters. We need not discuss this issue, since we have found error in the denial of the continuance on other grounds.

### III. *Mariah's section 388 petition*

Mariah maintains that the juvenile court abused its discretion when it denied her petition pursuant to section 388 to modify the court's previous orders and return the children to her. To succeed on a section 388 petition, a parent must show two things: (1) that there is new evidence or a change of circumstances and (2) that granting the petition would be in the children's best interests. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.)

16.

The section 388 petition was heard at the same time as the 18-month review. The juvenile court's denial of it was likely influenced by the department's late change of position and the new allegations to which Mariah had no fair opportunity to prepare a defense. Therefore, the ruling was tainted by the legal error we have already discussed and will have to be reversed and the matter reconsidered on remand.

## IV. *Sufficiency of evidence of risk of detriment*

To obtain a ruling that a child will not be returned to its parent after an 18-month review hearing, an agency must show that it would create a substantial risk of detriment to the child to return it. (§ 366.22, subd. (a).) The juvenile court made findings that returning the children to Mariah would create a substantial risk of detriment to them. Mariah argues that these findings were not supported by sufficient evidence.

It is unnecessary for us to consider this issue. A new hearing will be necessary for the reasons we have stated, and after that hearing the juvenile court will have to determine anew whether the necessary showings have been made.

## V. *Department's mootness claim regarding James*

The department "maintains that the matter of James A.[] is moot as he was in the custody of his father, [John T.], who successfully completed family maintenance. As such, the court awarded the father physical custody and terminated jurisdiction." These two sentences are the entirety of the department's argument on this issue.

An order terminating juvenile court jurisdiction generally renders an appeal from a previous order in the dependency proceedings moot. (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488; *In re Michelle M.* (1992) 8 Cal.App.4th 326, 330.) A dismissal for mootness is not automatic, however, and decisions on mootness claims must be made on a case-by-case basis. (*In re Kristin B.* (1986) 187 Cal.App.3d 596, 605; *In re Daisy H.* (2011) 192 Cal.App.4th 713, 716.)

Mariah appeals from the juvenile court's orders granting sole physical custody of James to his father and terminating jurisdiction.  We cannot say the court would have issued those orders if Mariah had had a fair opportunity to prepare a defense or if the court had not found that Mariah received reasonable reunification services.  In fact, it was in the context of its ruling on James that the court first expressed its reliance on the pornography allegations against which Mariah was denied a fair opportunity to defend herself.  In light of our decision to reverse the court's orders as to the other boys because of those issues, the appeal from the orders regarding James is not moot and those orders must be vacated and James's case remanded along with the others.

### *DISPOSITION*

The following orders of the juvenile court are vacated:  (1) the order terminating Mariah's family reunification services; (2) the orders establishing permanent plans of out-of-home placement for Richard O., David O., William O. and Jeremiah O.; (3) the orders granting sole physical custody of James A. to his father and terminating the court's jurisdiction; and (4) the order denying Mariah's section 388 petition.  The cases are remanded to the juvenile court for a new hearing consistent with this opinion.

_____

Oakley, J.[††]

WE CONCUR:

_____

Kane, Acting P.J.

_____

Franson, J.

_____

[††]Judge of the Superior Court of Madera County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18.